At a Court of Over and Terminer, held at this term, John Green was indicted and tried for the murder of Solomon Potter. Both the prisoner and the deceased were colored boys about fifteen or sixteen years of age. The evidence was that in the month of August preceding, and a few weeks prior to the killing, the prisoner had demanded of the deceased a small sum of money he owed him, and when told by the deceased that he could not pay him because he had not the money, he became angry and swore and cursed him a good deal, and then told him if he did not pay it he would be sorry for it. That two weeks before the killing he exchanged an old pistol without any lock which he had long owned for another without any trigger and gave a dollar in the exchange for it, and which he loaded with powder and an iron slug made of a rivet or piece of wrought nail on the day preceding the commission *Page 219 
of the act, and had it so loaded in his pocket on the night of that day when he rode on horse-back several miles from his home into Bridgeville where the deceased resided, and where he then enquired for him, but without meeting with him that night. The next morning on riding in a similar manner towards the town and when near it, he rode up to the deceased whom he found on the road side playfully boxing with another boy, and at once bade him to let that boy alone, and on his reply that he would not, he got off his horse, went up to him and took him by the arms, when the deceased did the same by him, but he soon bade the latter to let go of him, and after repeating it, told him if he did not let go of him he would shoot him, to which the deceased replied that he could not shoot anybody, he then said to him if he would let go of him he would show him, and soon the deceased let go of him when he put his right hand in his pocket, drew a pistol from it and leveling it at the deceased, who had now stepped backwards a step or two from him, and drawing the hammer of it back with his thumb, he let it fly forward when the pistol went off and shot the deceased who was then standing face to face in front of him and not more than a yard from him. The slug entered the abdomen of the deceased a short distance below" the breast bone, and penetrating to a depth of over four and a half inches, resulted in his death soon afterwards. As soon as the prisoner discovered that he had shot him, he remounted his horse and rode off very rapidly, and endeavored to avoid arrest by concealing himself, and when arrested made several false and contradictory statements in regard to the circumstance of their meeting and the encounter between them.
that neither the Court or the jury were to be governed in deciding the case by anything contained in the statutes of other States, but solely by the statute of our own State. What was murder at the common law, was murder under our *Page 223 
statute which merely divides it into two degrees, there being no such division of it at common law. Malice aforethought was the essential ingredient and criterion of it at the common law, and was of two descriptions, express malice aforethought, and malice aforethought, implied by law; but in either case it was murder, and was punishable with death at common law, while a division was made in it in that respect by our statute, it being made by it punishable with death only when committed with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death, and with fine, pillory, whipping and imprisonment for life when committed with malice aforethought implied by law; the former being denominated murder of the first degree, and the latter murder of the second degree by our statute. And as to the first it is sufficient in this case to say that the statute provides that every person who shall commit the crime of murder with express malice aforethought, shall be deemed guilty of murder of the first degree and shall suffer death.
Malice in the sense in which the law here employs that term, is not confined or limited to hatred, spite, revenge or malevolence towards the deceased in particular, but imports that general malignity and recklessness of the lives and personal safety of others, and is the dictate of a wicked, depraved and malignant heart devoid of a just sense of social duty, and fatally bent on mischief. And express malice aforethought at common law is generally defined to be where one person kills another with a sedate deliberate mind and formed design; such formed design being evidenced by external circumstances, discovering the inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some bodily harm. And though it is termed express malice aforethought, it does not require, as we see from this definition, to be proved that the accused ever expressed or uttered that formed design, but it may be proved by circumstantial evidence, such as lying in *Page 224 
wait, antecedent menaces, former grudges, and concerted schemes to do the party killed by him some bodily harm, because these facts or circumstances show the sedate deliberate formation of the design to commit the act before it was committed. And as evidence of express malice aforethought to be satisfactory to a jury on an indictment for murder at common law, that sedate deliberate mind and formed design might have been either to kill the deceased, or to do him some bodily harm or injury, which though it might not have been so intended by the accused when committed, did in fact, result in his death, as was ruled in an early case after mature consideration by all the Judges and Barons in England, in which a park-keeper who caught a boy stealing wood in the park with a rope around his body, one end of which the park-keeper tied to the tail of the horse he was riding on when he surprised him in the act, and the boy making no resistance, then struck him two blows on his back when the horse took fright and ran off dragging the boy behind him on the ground, and so injured him that he soon after died of the injuries; and on which evidence he was condemned and hung. Halloway's Case. Cro. Car. 131. And this definition of express malice aforethought at common law recognized and ruled repeatedly in later cases with only one qualification, and that is, that such deliberately formed design may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon, or any dangerous instrument likely to produce death, by privily lying in wait, a previous quarrel or grudge, the preparation of poison, or other means of doing great bodily harm, or the like. So that it must now appear from the circumstances attending the act that such formed design was either to kill, or to do some great bodily harm to the deceased which caused his death. 3 Greenl. Ev.Sec. 145. Many of the States have also divided the crime of murder into two or more degrees, and have materially modified and varied this principle of the common law, some of them making the *Page 225 
deliberate intention to kill, the sole and necessary criterion of express malice aforethought and of murder of the first or greatest degree under them. But inasmuch as the common law definition of the crime of murder and of express implied malice aforethought, as constituting the essential element and characteristic of it, was the only rule or definition we ever had in this State up to the time when the crime was divided into two degrees under the Revised Statutes in 1852, and that division simply provides in the first place on this subject that "every person who shall commit the crime of murder with express malice aforethought," shall be deemed guilty of murder of the first degree under the statute, without any definition of it, or saying what shall constitute the evidence or the indications of such malice aforethought, and the test of the crime of murder of the first degree under the statute, we are necessarily remitted, of course, to the common law for the legal meaning and definition of those terms, and of the meaning of the statute which has thus adopted them without any explanation or qualification of them. As to the question how long a time it will require in contemplation of law for the formation of such a design, or what amount of sedate premeditation is necessary to constitute the commission of the act a case of murder with express malice aforethought, the only proper answer is that the question of time does not enter into it, for if it be calmly and deliberately formed, though in a moment, and as soon as formed executed, it would be evidence of express malice aforethought; and therefore on that point to illustrate the meaning of the rule in this case he would say that if the prisoner at the time he took the pistol from his pocket and pointed it at the deceased and discharged it, had deliberately formed a design in his mind to shoot him with it, having committed that act with a deadly weapon, which was naturally calculated under the circumstances proved and at the short distance the parties then stood from each other, to inflict a mortal wound upon the deceased, it was committed with express malice *Page 226 
aforethought, and was murder of the first degree under the statute. And upon this allegation, which it was necessary for the State to prove as a fact to the satisfaction of the jury beyond any reasonable doubt, that it was pointed and fired at the deceased with a deliberately formed design and intention at that moment on the part of the prisoner to shoot him with it, they would have to consider well the testimony of the only witness who was present at that time, and who testified that he and the deceased were playing and boxing with each other in the public road when the prisoner rode up on a horse and stopping at once bade the deceased to let him alone, to which he replied that he would not, when the prisoner dismounted, stepped up to the deceased and took hold of him by both of his arms, and that the deceased also then took hold of the prisoner in the same manner. That the prisoner soon tried to release himself from the hold of the deceased, and not succeeding in the effort, told him to let go of him, but the deceased did not, and soon the prisoner again told him to let go of him, and if he did not, he would shoot him, to which the deceased replied that he couldn't shoot any body, to which the prisoner rejoined that if he would let go of him, he would show him, and that the deceased then let go of him, when the prisoner put his hand in his pocket, drew from it the imperfect pistol proved and in evidence before them, and leveling it at the deceased who at that moment stepped backwards a step or two but not more than a yard from him, and still facing him, drew back the hammer of it with the thumb of the same hand in which he held the pistol, there being no trigger to it, when it quickly passed from his thumb, which fired and discharged it, and the deceased was shot and mortally wounded by it, as described by the physician who was instantly called to see him, and died of the wound soon afterwards.
It would be the duty of the jury to consider well this and all the rest of the testimony in the case, and to determine from it whether the prisoner in the manner *Page 227 
described and detailed by the witness, intentionally discharged and shot off the pistol at the deceased, and if so, whether it was so discharged by him with a sedate deliberate mind and formed design to shoot the prisoner with it. If after so considering the evidence, the jury should be satisfied beyond a reasonable doubt that such was the case, then it would be their duty to find that he committed the act with express malice aforethought, and is guilty of murder of the first degree under the statute; for if he so committed the act, having done it with such a deadly weapon as a loaded pistol, the law assumes that he contemplated and intended the ordinary and natural consequences of it to the deceased. And in considering and determining this question of fact as to whether the act was, or was not, committed with a deliberately formed design by the prisoner, it would be proper for the jury to take into consideration in connection with the testimony before particularly referred to, the evidence in regard to the alleged previous grudge of the prisoner against the deceased, also the alleged previous threat or menace made by him that if he did not pay him, he would be sorry for it, and also the evidence before them in regard to the procurement and the previous preparation and loading of the pistol by the prisoner. But, if the jury on the contrary should be satisfied from the evidence that the act was done accidentally and unintentionally by the prisoner, then it was excusable in law, and he should therefore be acquitted.
As our statute provides in the first section that every person who shall commit the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate any crime punishable with death, shall be deemed guilty of murder of the first degree, and shall suffer death, and in the second section that every person who shall commit the crime of murder otherwise than is set forth in the first section, shall be deemed guilty of murder of the second degree, and shall be otherwise punished as is set forth in the second section, that is to say *Page 228 
with fine, pillory, whipping and imprisonment for life; and as the object of the statute in dividing the crime of murder as it before existed in this State, and still exists at common law, was to make the penalty of it death only when committed with express malice aforethought, or in perpetrating, or attempting to perpetrate any crime punishable with death, and to moderate and reduce the penalty of it to fine, pillory, whipping and imprisonment for life when committed otherwise than is specified in the first section, the terms otherwise committed must be understood to mean when committed with implied malice aforethought in the sense in which those terms were then used and understood at common law, or they will be wholly without meaning or signification, and there could be no crime of murder with implied malice, or of the second degree under the statute. According to the common law definition of it, malice is implied by law from any deliberate cruel act committed by one person against another, however sudden, thus where one person kills another suddenly without any, or without a considerable provocation, the law implies malice. The distinction between it and express malice, particularly, is when the act is committed suddenly without any provocation; but the importance of it practically was but comparatively slight at common law, as the penalty was the same, and was death whether it was committed with express or with implied malice. Our statute however, nice as it may be in some cases, has made it one of vital importance to the accused in all such cases, by making implied malice aforethought in contradistinction to express malice aforethought, the sole criterion of the crime of murder of the second degree under its provisions. To constitute the considerable provocation here referred to in the definition just stated, in order to rebut or negative the implication of malice aforethought in such a case of sudden killing, it must be as least sufficient in law to reduce the killing to the crime of manslaughter; and as the only facts or circumstances disclosed in this case which can have any bearing on that *Page 229 
point was the failure of the deceased to pay the prisoner a small sum of money which he owed him, and demanded of him by the prisoner a few weeks prior to the commission of the act, and the brief and apparently playful struggle between them immediately preceding the commission of it, and the evidence as to which he had already recapitulated, he would read from a work of acknowledged authority the established doctrine of the common law in regard to the kind and degree of provocation which is required to extenuate and reduce the killing in such cases from the crime of murder at common law, and of either degree under the statute, to the crime of manslaughter. As the indulgence which is shown by the law in some cases to the first transport of passion is a condescension to the frailty of the human frame, to the furor brevis which while the frenzy lasts, renders a man deaf to the voice of reason, so the provocation which is allowed to extenuate in the case of homicide must be something which a man is conscious of, which he feels and resents at the instant the act he would extenuate is committed. All the circumstances of the case must lead to the conclusion that the act done, though intentional of death or great bodily harm, was not the result of a cool, deliberate judgment and previous malignity of heart, but solely imputable to human infirmity. For there are many trivial, and some considerable, provocations which are not permitted to extenuate an act of homicide, or rebut the conclusion of malice to which the other circumstances of the case may lead. No breach of a man's word or promise, no trespass, either to lands or goods, no affront by bare words or gestures, however false or malicious and aggravated with the most provoking circumstances, will free the party killing from the guilt of murder. And it is conceived that this rule will govern every case where the party killing upon such provocation makes use of a deadly weapon, or otherwise manifests an intention to kill, or to do some great bodily harm. 1 Russ. on Crimes 513, 514. The distinguishing characteristic between the crime of murder and the crime of *Page 230 
manslaughter at common law being that while the former cannot be committed without malice aforethought, either express or implied, the latter cannot be committed with malice either express or implied.
This extenuation on the ground of provocation usually arises in cases of mutual combat or fighting between the parties in which a violent transport of anger and passion had Suddenly impelled the one to inflict a fatal blow or wound upon the other, and before there was time for the passion to subside and reason to restrain the furor brevis
which impelled it. And yet, even in such cases where there was not time for the passion to subside and reason to resume its sway, the combat or fight will not be a sufficient provocation to extenuate and reduce the killing to manslaughter, if the evidence be sufficient to satisfy the jury that the slayer had provided himself with a deadly weapon beforehand in anticipation of the fight, and not for the defense of his person against a felonious assault apprehended by him from the other party. 3 Greenl. Ev. Sec. 121. But according to the evidence in this case the collision between the prisoner and the deceased which immediately preceded the shooting, did not amount to a combat or fight, perhaps, at any time between them, no blows having teen struck by either, but at most, in contemplation of law, to a mutual assault and battery only, consisting of their seizing each other by both their arms and a struggle of strength for a few moments between them in which it seems the deceased proved too strong for the prisoner, and from which he soon voluntarily released him after the prisoner had twice threatened to shoot him if he did not do so on his bidding, with the taunt that he couldn't shoot any body. And yet when the provocation consists of an assault merely of this kind, the law holds that it must appear that the provocation was considerable, and not slight only, in order to reduce the homicide to manslaughter, and that for this purpose the use of reproachful words however insulting or opprobrious, or of actions or gestures expressive of contempt or reproach, without an *Page 231 
assault, actual or menaced, on the person of the slayer will not be sufficient, if a deadly weapon be used by him; but if the fatal stroke be given by the hand only, or with a small stick, or other instrument not likely to kill, a less provocation will be sufficient to reduce the offense to manslaughter: and, therefore, the killing has been held to be only manslaughter, though a deadly weapon was used, where the provocation was by pulling the nose, purposely jostling the slayer aside in the highway, or other actual battery. 3 Greenl. Ev. Sec.
122. But notwithstanding under certain circumstances an assault by the deceased upon the prisoner may be sufficient to rebut the general presumption of malice arising from the killing, yet it must not be understood that every trivial provocation which in point of law amounts to an assault, or even a blow, will as a matter of course reduce the crime to manslaughter. For where the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner or the continuance of it, and beyond all proportion to the offense, it is rather to be considered as the effect of a brutal and diabolical malignity than of human frailty, and is one of the symptoms of that which the law denominates malice, and the crime will amount to murder notwithstanding such provocation. Ros. Cr. Ev. 725. 1East. P. C. 234. 1 Russ. on Crimes, 515.
It would therefore be the duty of the jury to consider and determine from all the facts and circumstances proved in the case, and upon the law as thus announced and defined to them, whether the prisoner willfully and intentionally shot the deceased with the pistol in question, and if so, whether the act was committed by him with express malice aforethought, as before defined and explained to them; and if such should be the conclusion of the jury on all the evidence, then it would be their duty to convict the prisoner in manner and form as he stands indicted, that is to say, of murder of the first degree. But should not the jury be so satisfied, and come to the conclusion that it was committed in a sudden transport of *Page 232 
passion produced by the mutual assault in which the parties had immediately before been engaged, and before it had subsided, if such a passion had been excited in the prisoner by it, and without previous malice or malevolence on the part of the prisoner against the deceased, and also that it was committed without a considerable provocation thereby given him by the deceased, such as would be sufficient according to the law laid down to them on that point, to extenuate the act and to reduce the killing to manslaughter, then in contemplation of law it was committed with implied malice, and their duty would be to convict him of the crime of murder of the second degree. But if, on the contrary, they should be satisfied from the evidence that the act was so committed by him in a sudden transport of passion produced as just before mentioned and without previous malice or malevolence as before stated, but with and upon such a considerable provocation thereby given him by the deceased as has also just before been stated, then the legal implication of malice would be rebutted, and it would be their duty to convict him of the crime of manslaughter. For under the indictment the prisoner may be convicted of either of these crimes. As thefactum of the killing of the deceased by the prisoner has been proved and is not denied, it is presumed in law to have been done with malice aforethought, and it is therefore incumbent upon him to prove to the satisfaction of the jury that it was not done maliciously, unless it should so appear from the evidence offered against him. All the facts and circumstances proved in the case together with the weapon used, its imperfection, the manner in which it was loaded, the way in which he fired it, and the youthful age of the prisoner, with the questions of law involved in it, were all before the jury and upon which it would now be their solemn duty after a careful, complete and conscientious consideration of them, to decide and determine whether the act of shooting the deceased was willfully and intentionally committed by him, and if so, whether he was *Page 233 
guilty of the crime of murder of the first degree, or of murder of the second degree, or of manslaughter in committing it, and in thus killing the deceased, bearing in mind, however, that it will also be your duty at every stage "of this progressive enquiry as to his guilt, from the first to the last, to give the prisoner the benefit of any reasonable and conscientious doubt which you may have as to his guilt, or the degree or grade of the crime, if he is guilty of either under the indictment, and which it was the province of the jury, and not of the Court, to determine.
 Verdict — Guilty of murder of the first degree.